OPINION OF THE COURT
 

 Smith, J.
 

 The primary issue in this custody proceeding is the continuing
 
 *963
 
 subject matter jurisdiction of the New York State courts in view of the Federal Parental Kidnaping Prevention Act ([PKPA] 28 USC § 1738A) and New York’s Uniform Child Custody Jurisdiction Act (UCCJA), article 5-A of the Domestic Relations Law. Following a hearing, Supreme Court ordered that custody of the only child of the parties, now living in Wyoming with defendant mother, be transferred to the father, who resides in New York State. The Appellate Division affirmed, and so do we.
 

 I
 

 Plaintiff-respondent (father) and defendant-appellant (mother) were married in June 1985, in West Point, New York. Five years later, in July 1990, they had a daughter. In March 1991, six months after the child’s birth, the parties separated. In June 1991, the father commenced an action for divorce in New York County, where he had moved after the separation. That same month, the mother, along with the child, who was then 11 months old, left the marital home in Sloatsburg, New York, for Shreveport, Louisiana.
 

 In December 1992, New York Supreme Court granted a judgment of divorce, incorporating by reference a comprehensive settlement agreement, the terms of which had been negotiated by mother and father in open court in July 1991, and which survived the judgment. When the judgment was granted, mother and child were living in Las Vegas, Nevada, where they had moved in July 1992. Under the settlement agreement, mother had sole legal custody of the child. Father had visitation rights in accordance with a detailed schedule. The settlement agreement provided that “[i]t is expressly understood and agreed that so long as one of the parties herein is a resident of the State of New York, the Supreme Court of the State of New York shall retain personal jurisdiction of the parties, of the child, and of the case, for all purposes.”
 

 In January 1992, six months after mother and child had moved to Louisiana, mother filed an action in Louisiana seeking to modify the custody and visitation arrangement that had been agreed to in open court in July 1991. The father obtained an order from New York Supreme Court enjoining mother from continuing the action and she ultimately abandoned it.
 

 In January 1993, the mother and child moved to Cheyenne, Wyoming. Later that year, in November, father moved in New York for sole custody in New York, claiming that the mother’s
 
 *964
 
 relocations were intended to deprive him from having contact with his daughter. Mother responded by denying father’s allegations, and stating in effect that if the court intended to deny the motion, it should exercise jurisdiction, but if the court was inclined to grant the motion, she should be given an opportunity to file a cross motion seeking to dismiss the action because New York was an inconvenient forum. Supreme Court held father’s motion in abeyance, pending a referee’s report. Supreme Court then denied mother’s motion for renewal and reargument, in which she argued that New York was an inconvenient forum. The Appellate Division unanimously affirmed (210 AD2d 170 [1994]).
 

 The Referee heard testimony from the child’s three prior nannies, crediting their testimony that mother had “denigrated and foul-mouthed the father in [the child’s] presence, and tried to alienate [the child] from her father.” Two of the experts who testified supported the father. The first was a clinical psychologist who had been appointed to investigate mother’s allegation that father had sexually abused the child. The witness concluded that the allegation was unfounded and suspected that it was made to affect the custody dispute. The second witness was a forensic psychologist who had been appointed by the court in 1992 to help mother and father establish an appropriate visitation schedule, and again in 1994 to evaluate the parties. She also concluded that mother’s allegations of sexual molestation were unfounded. Mother offered the testimony of, among others, the child’s therapist in Wyoming.
 

 In his report dated October 8, 1997, the Referee stated the following:
 

 “I find that [the child] is a normal, healthy, physically and emotionally fit, intelligent and pretty little girl, of seven.
 

 “I find that both parents are loving, caring parents who can equally be entrusted with the custody of [the child] and that they both have appropriate facilities to do so. I do not find the mother less fit.
 

 “I also find that both parents hate each other and that this hatred causes tension in the child, who is unavoidably caught between them in their constant tug-of-war for her love and affection.
 

 “However, the established visitation rights have
 
 *965
 
 not been interfered with. At most, it can be argued, that the mother’s attitude towards the father, explicit and implicit, has so aifected [the child], that she often refuses to come to the phone, when her father calls from New York and she is with her mother in Cheyenne, Wyoming.”
 

 The Referee recommended that custody and visitation remain unchanged, but that the mother be enjoined from alienating the child from the father, as well as from interfering with his right of visitation and to speak to her on the phone. The Referee also granted a motion by the mother to enroll the child in a parochial school, finding it in the child’s best interest. The Referee did not decide a motion by the mother for an award of counsel fees, or an application for upward modification of child care and medical expenses because she did not present the necessary evidence.
 

 Meanwhile, in 1995, the mother adopted a second child, from Bulgaria, who is about the same age as the subject child. The three lived together in a house the mother purchased in Cheyenne, Wyoming. The father eventually remarried and purchased a home in Tuxedo Park, New York, where he lives with his wife and their daughter.
 

 Before Supreme Court decided whether to accept or reject the Referee’s report, the parties entered into an agreement in April 1998, which generally modified the July 1991 agreement incorporated into the December 1992 judgment of divorce by extending the father’s visitation rights in exchange for his discontinuing the motion for sole custody and other motions related to the mother’s enrollment of the child in a parochial school.
 

 Four months later, in August 1998, the mother commenced a proceeding in Wyoming, seeking to change the father’s right to visitation. The father obtained an order in New York restraining the mother from proceeding in Wyoming. The mother ultimately consented to the dismissal of the Wyoming action.
 

 In January 2000, the father brought an order to show cause seeking to hold the mother in contempt for failing to abide by the visitation schedule. The mother moved for dismissal of the motion, claiming that the child refused to visit her father and forcing her to do so was against her best interests. The mother also argued that New York should decline jurisdiction because New York was an inconvenient forum. In June 2000, the court again appointed the forensic psychologist to evaluate the parties and report to the court.
 

 
 *966
 
 Relying on an August 2000 report by the forensic psychologist, the court concluded that the mother “has removed the child from the jurisdiction and essentially cut off the relationship with the father and the child. If I remove these court proceedings to the same jurisdiction, I am further enabling the mother to continue this pattern of removal. We have a valid basis for jurisdiction and that is denied.” The court ordered a hearing on the contempt motion. In her extensive report, the psychologist expressed concerns that the mother “could not be counted upon to fulfill the court-ordered visitation.” The psychologist also recommended a change from sole custody to joint custody, with the father having authority over certain aspects of the child’s life.
 

 In February 2001, the mother again argued that the court lacked subject matter jurisdiction over the contempt hearing. The court denied the motion, as well as a motion for reargument and renewal.
 

 The hearing took place in July 2001. The forensic psychologist testified that the child’s unwillingness to travel to New York that summer to see her father was caused by the mother’s “ongoing and relentless alienation to which the child is subjected based upon” the mother’s “distrust, anxiety, and anger at” the father. The mother played “a very active role in many ways in discouraging visitation with the father.” On cross-examination, the psychologist explained that the child’s “tie, her loyalty, her struggle, her hostilities are all based upon her feeling that her mother does not want her to see her father, have fun with him, spend time with him and that it is a betrayal of the mother’s love and care for her if she does that. This child is in a terrible, terrible dilemma.” The psychologist also testified that it would be “very much” in the child’s interest to see her father regularly. In the psychologist’s view, however, the mother was incapable of taking the necessary steps to encourage the child to visit her father.
 

 Several days later, the court placed the mother’s counsel on notice that the court would consider a change of custody, and that before deciding, the court wished to hear from the mother and the child. When the hearing resumed on August 3, 2001, the court heard testimony from the father, his present wife, his mother, and his sister-in-law. The mother did not appear in court and did not offer witnesses. The mother’s attorney informed the court that “it [was] impossible” for her to appear in court. The court held the mother in contempt and changed custody to the father.
 

 
 *967
 
 The mother then filed a petition in a Wyoming court seeking to enforce the 1992 settlement agreement, arguing that New York courts lacked subject matter jurisdiction to modify the agreement. In December 2001, the Wyoming court rejected the mother’s petition, holding that it had no jurisdiction because New York had exercised continuing jurisdiction over this action. In August 2002, the Appellate Division unanimously affirmed Supreme Court’s decision. This Court granted leave to appeal, and we now affirm.
 

 II
 

 At the time of the commencement of this proceeding, custody decrees were governed by the Uniform Child Custody Jurisdiction Act, article 5-A of the Domestic Relations Law.
 
 [1]
 
 According to the Governor’s Approval Memorandum, the UCCJA was enacted in order to curb the tendency, that was prevalent at the time, of “a disgruntled parent * * * to relitigate an adverse custodial degree in a more hospitable state” (1977 McKinney’s Session Laws of NY, at 2514). As we have stated, “[t]he UC-CJA represents a considered effort to give stability to child custody decrees, minimize jurisdictional competition between sister States, promote co-operation and communication between the courts of different States, all to the end of resolving custody disputes in the best interests of the child”
 
 (Vanneck v Vanneck,
 
 49 NY2d 602, 608 [1980] [citations omitted]).
 

 Congress has also enacted the Parental Kidnaping Prevention Act (28 USC § 1738A). Among other things, the PKPA seeks to “promote cooperation between State courts to the end that a determination of custody and visitation is rendered in the State which can best decide the case in the interest of the child; * * * [and] deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards” (Pub L 96-611 § 7 [c] [1], [6], reprinted in Historical and Statutory Notes following 28 USCA § 1738A).
 

 The mother does not dispute that, under the PKPA, Supreme Court had subject matter jurisdiction over the original settlement agreement in 1992, granting her sole custody of the child. The relevant section of the PKPA states as follows:
 

 “(c) A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if—
 

 
 *968
 
 “(1) such court has jurisdiction under the law of such State; and
 

 “(2) one of the following conditions is met:
 

 “(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child’s home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State” (28 USC § 1738A [c] [1], [2] [A]).
 

 New York was the child’s “home State” because she had lived in New York for at least six consecutive months before the commencement of the proceedings with the mother, who resided in New York, as did her father (28 USC § 1738A [b] [4]).
 

 Subsection (c) (2) of the PKPA contains four other subparagraphs in addition to subparagraph (A). If subparagraph (A) does not apply generally because the child has no home state, a court has authority to exercise jurisdiction under subparagraph (B) if
 

 “(ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child’s present or future care, protection, training, and personal relationships.”
 

 Subparagraph (C) involves a situation where the child is physically present and has been abandoned or subjected to or threatened with mistreatment or abuse. Under subparagraph (E) the court must have “continuing jurisdiction pursuant to subsection (d) of this section.” If none of the conditions mentioned applies, subparagraph (D) allows jurisdiction if one state declined jurisdiction under the view that another state provides the more appropriate forum, and it is in the best interest of the child that the latter state exercise jurisdiction.
 

 Ill
 

 At issue now is whether Supreme Court (affirmed by the Appellate Division) properly had continuing jurisdiction and
 
 *969
 
 changed custody to the father in New York after the mother and child had been living in Wyoming for several years. The mother argues that the PKPA preempts state law which may be inconsistent with its terms and, accordingly, New York lacked subject matter jurisdiction. The question is whether New York had “continuing jurisdiction pursuant to subsection (d)” of the PKPA, which states:
 

 “(d) The jurisdiction of a court of a State which has made a child custody or visitation determination consistently with the provisions of this section continues as long as the requirement of subsection (c) (1) of this section continues to be met and such State remains the residence of the child or of any contestant.”
 

 Thus, New York would be able to exercise continuing jurisdiction if the requirement of subsection (c) (1) is met and if New York remains the father’s residence. The PKPA, then, allows a court to modify its custody order as long as it is authorized to do so by the law of the state. For that we turn to New York’s Domestic Relations Law.
 

 Domestic Relations Law § 75-d (1) (b), in effect at the time of this proceeding, states that
 

 “[a] court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree only when: * * *
 

 “(b) it is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is within the jurisdiction of the court substantial evidence concerning the child’s present or future care, protection, training, and personal relationships.”
 
 [2]
 

 The fact that Domestic Relations Law § 75-d (1) (b) is almost
 
 *970
 
 identical to subsection (c) (2) (B) of the PKPA is inescapable. But there are important differences. First, subsection (c) (2) (B) generally applies if subparagraph (A) does not apply, that is, if the child does not have a “home State” or the proceeding was commenced six months after the child left the “home State.” Section 75-d (1) of the Domestic Relations Law does not have that requirement. More importantly, subsection (c) (2) (B) of the PKPA applies only to initial custody determinations and modifications of another state’s custody determination,
 
 [3]
 
 whereas section 75-d (1) of the Domestic Relations Law applies to those situations and to the exercise of continuing jurisdiction. Under the PKPA, if the matter involves “continuing jurisdiction” then subsection (d), which does not include a “home State” requirement, may apply. Subsection (d) is satisfied if one of the contestants lives in New York and the court has jurisdiction under section 75-d (1) of the Domestic Relations Law. It is entirely logical that the PKPA generally requires that the children live in the state for six months before the State can make a custody determination, but does not require it in the case of continuing jurisdiction, since by then the children might not be living in the state that made the initial custody determination.
 

 
 *971
 
 Contrary to the mother’s contention, the provision in subsection (d) of the PKPA that “the requirement of subsection (c) (1) of this section continues to be met” does not mean that subsection (c) (2) must also be met. If that had been the intention of the drafters, they could have easily stated it. The conjunctive “and” at the end of subsection (c) (1), after the semicolon, does not serve to conflate the two separate subsections. This interpretation, that subsections (c) (1) and (c) (2) must be read together, is not only contrary to the plain meaning of subsection (d), but also completely at odds with the purpose of the PKPA. According to the mother, a state that has made an initial custody dispute loses subject matter jurisdiction over the case once another state has become the child’s “home State,” which occurs in six months. As her argument goes, the section to look to is subsection (c) (2) (B) of the PKPA, which preempts section 75-d (1) (b) of the Domestic Relations Law. The loss of jurisdiction would be per se. The court is not to engage in an analysis as to whether, under the circumstances, the court should cede jurisdiction to the other state. Such interpretation would essentially encourage “unilateral removals of children undertaken to obtain [favorable] custody and visitation” (Pub L 96-611 § 7 [c] [6]) — the very antithesis of the statutory purpose. On the other hand, section 75-d (1) (b) of the Domestic Relations Law calls for a determination of whether the exercise of jurisdiction is appropriate.
 

 IV
 

 Relying on this Court’s reasoning in
 
 Vanneck,
 
 the mother argues that the significant connection test of Domestic Relations Law § 75-d (1) (b) requires that the child and parents or the child and one contestant have maximum rather than minimum contacts with this state. We stated in Vanneck:
 

 “Particularly relevant to the jurisdictional determination is whether the forum in which the litigation is to proceed has ‘optimum access to relevant evidence’ (Prefatory Note of Commissioners on Uniform State Laws, 9 ULA [Master Ed], § 3, p 124). Maximum rather than minimum contacts with the State are required (id.). The general language of this subdivision permits a flexible approach to various fact patterns. This imprecision, however, must not destroy the legislative design ‘to limit jurisdiction rather than to proliferate it’ (id.)” (49 NY2d at 610).
 

 
 *972
 
 The Appellate Division found that the child had a significant connection to New York and that substantial evidence concerning her present and future welfare existed in New York. The Court stated:
 

 “Since the child was born here, the parties were married and divorced here, the father has continued to reside here, and the child has visited him here, the substantial connection test is met. In addition, the court heard testimony from the father and his family at the hearing, showing that substantial evidence exists within New York regarding the issue of the child’s future care. Thus, New York properly asserted subject matter jurisdiction to determine this custody dispute” (296 AD2d 186, 191-192 [2002] [citations omitted]).
 

 The mother argues that with respect to the “significant connection test,” the Appellate Division applied a “minimum contact” standard rather than “maximum contact.” The Court, however, stated that the “substantial connection test” was met. Substantial and significant are synonymous. More importantly, the evidence supports the finding of a significant connection. While
 
 Vanneck
 
 emphasizes the importance of a state’s durable contacts with a child, the case contemplates a flexible approach in determining whether the test is satisfied.
 

 It is undisputed that the father has a significant connection to New York. The mother argues that the child has no significant connection to New York because she has been living in Wyoming since January 1993. The child’s significant connection to Wyoming, however, does not diminish her significant connection to New York as well. She is a New Yorker by birth, and lived in New York for about a year until the divorce, when the mother relocated with her to Louisiana, then Nevada, and then Wyoming. New York is the father’s home as well as the home of the child’s half sister and other relatives. The child has lived in the father’s home during summers and holidays and has spent time with her relatives in New York. In addition, New York courts have been in the child’s life since she was a toddler, making decisions about what is in her best interest. New York has been a significant part of her life, and would have been even more significant but for the mother’s contumacious behavior over the past decade.
 

 As to the second prong, one need only look at the extensive record on appeal, which contains substantial evidence regard
 
 *973
 
 ing the child’s present and future welfare that has been gathered throughout the lengthy history of this proceeding in New York courts.
 
 [4]
 
 Significant among this evidence is the testimony and report of the forensic psychologist, who has been involved in this case, at the request of the court, since 1992 when the child was IV2 years old.
 

 In short, applying the flexible approach of Domestic Relations Law § 75-d (1) (b) to the facts of this case, the record supports the determination that the child has a significant connection to New York, and that there exists substantial evidence regarding her present and future welfare.
 

 Finally, we have no basis to disturb the conclusion of Supreme Court, affirmed by the Appellate Division and supported by the record, that the change of custody was in the child’s best interest. The mother’s move in this case was authorized pursuant to the settlement agreement granting her sole custody. The parties, however, agreed that New York would retain personal jurisdiction over the parties as long as one resided here, and over “the case, for all purposes.” While the move was not without the father’s approval, the record demonstrates that it was undertaken by the mother in the hope of thwarting visitation and minimizing the father’s access to his child.
 

 We have reviewed the mother’s other arguments and find them without merit.
 

 Accordingly, the order of the Appellate Division should be affirmed, without costs.
 

 Chief Judge Kaye and Judges Ciparick, Rosenblatt, Grafpeo and Read concur.
 

 Order affirmed, without costs.
 

 [1]
 

 . Effective April 28, 2002, the UCCJA has been superseded by the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA).
 

 [2]
 

 . The recent replacement of the UCCJA by the UCCJEA makes clear the demarcation between initial custody determinations and continuing jurisdiction by placing them in different sections. The section relating to continuing jurisdiction is Domestic Relations Law § 76-a, which provides as follows:
 

 “§ 76-a. Exclusive, continuing jurisdiction
 

 “1. Except as otherwise provided in section [76-c] [emergency jurisdiction to protect a child in danger of abuse and mistreatment] of this title, a court
 
 *970
 
 of this state which has made a child custody determination consistent with section [76] [initial custody determination] or [76-b] [modification of another court’s custody determination] of this title has exclusive, continuing jurisdiction over the determination until:
 

 “(a) a court of this state determines that neither the child, the child and one parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child’s care, protection, training, and personal relationships; or
 

 “(b) a court of this state or a court of another state determines that the child, the child’s parents, and any person acting as a parent do not presently reside in this state.
 

 “2. A court of this state which has made a child custody determination and does not have exclusive, continuing jurisdiction under this section may modify that determination only if it has jurisdiction to make an initial determination under section [76] of this title.” Paragraph (a) is essentially the same as paragraph (b) of Domestic Relations Law § 75-d (1), except that Domestic Relations Law § 76-a makes continuing jurisdiction the presumptive rule unless rebutted, and omits the language about “the best interest of the child.”
 

 [3]
 

 . In the latter instance, subsection (c) (2) (B) applies through subsection (f), which provides as follows:
 

 “A court of a State may modify a determination of the custody of the same child made by a court of another State, if—
 

 “(1) it has jurisdiction to make such a child custody determination; and
 

 “(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.”
 

 [4]
 

 . While not affecting the outcome of this appeal, although validating it, we cannot close our eyes to recent unfortunate and disturbing events in this case that have been brought to our attention by the father’s counsel. On September 5, 2003, a Wyoming court placed the child in the custody of the Wyoming Department of Family Services based on a neglect petition alleging that the child, as well as the adopted child, were neglected under Wyoming law. The petition states that the adopted child was placed in protective custody. Specifically, the petition alleges that the mother verbally and physically abused the adopted child, that the home was unsanitary, particularly the part where that child lived, and that the mother threatened to kill herself and both children if the father obtained custody.