Matter of Grace G. v Beeno G. (2006 NY Slip Op 51443(U))

[*1]

Matter of Grace G. v Beeno G.

2006 NY Slip Op 51443(U) [12 Misc 3d 1184(A)]

Decided on July 14, 2006

Family Court, New York County

Schechter, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected in part through July 25, 2006; it will not be published in the printed Official Reports.

Decided on July 14, 2006

Family Court, New York County
In the Matter of a Proceeding for Custody Under Article 6 of the Family Court Act Grace G., Petitioner
against
Beeno G., Respondent.
V-03270-06

Sheila D. Norman, Esq.
Norman and Bullington. P.A.
1905 West Kennedy Boulevard
Tampa, FL 33606
Special appearance for the mother (Florida)
Lawrence J. Hodz, Esq.
Maney & Gordon, P.A.
101 East Kennedy Boulevard, Suite 3170
Tampa, FL 33602
For the father (Florida)
Jonathan D. Factor, Esq.
267 Broadway
New York, NY 10007
For the mother (New York)

Sara P. Schechter, J.
Petitioner seeks custody of her daughter Shedine, born October 16, 1998, in Trinidad and Tobago. Petitioner mother and Respondent father are both citizens of Trinidad and Tobago, and were married in that country. The mother arrived in the United States in 2000, settling in New York. The father arrived in New York in 2002 and then moved to Florida about three months later. (Petitioner maintains Respondent did not reside in the United States until 2003, however Respondent produced an employer's identification card issued in New York City in 2002.) It is not disputed that Shedine has never resided in the United States, but has visited the parents several times in New York and Florida. Throughout, Shedine has resided in Antigua and Barbuda and Trinidad and Tobago with relatives. Her primary caretaker from infancy has been her paternal grandmother.
[*2]
The mother and father were divorced in the State of New York on May 5, 2004, after Respondent had moved to Florida. In the divorce proceeding, Respondent appeared and waived his right to answer, submitting to New York's jurisdiction. The divorce decree makes no mention of the child of the marriage, and makes no determination of custody, contrary to New York law (see Domestic Relations Law § 240 [1] [a] ("[i]n any action or proceeding. . . for a divorce. . . the court shall require verification of the status of any child of the marriage with respect to such child's custody and support, including any prior orders, and shall enter orders of custody and support as, in the court's discretion, justice requires. . ."). Petitioner testified that her attorney in the divorce proceeding advised her not to mention the child, as the child did not reside in the United States and had no legal immigration status. There has never been a prior adjudication of custody, nor have any documents of custody been provided to the paternal grandmother while she was serving as primary caretaker to Shedine. Rather, various letters of authorization and permission were supplied by both parents on an as-needed basis. 
The Child's Removal to New York
On March 8, 2006, Shedine flew into Miami, Florida with her paternal grandmother. The father intended that Shedine would change planes there and then fly to Tampa, Florida to attend his wedding, in which Shedine was to have been a participant. The father submitted in evidence a travel itinerary confirming Shedine was booked on a connecting flight to Tampa from Miami. However, Shedine never boarded that flight. Rather, the mother met the child in the airport and removed her to New York City by plane. The circumstances of this removal are disputed. The mother maintains that the paternal grandmother had informed her that the child would be in Miami and willingly turned the child and her belongings over to the mother so the two could return to New York together. The mother claimed that this was pursuant to an agreement between her and the father that Shedine would come to live with the mother after the mother completed her schooling. This court finds the mother's explanation to be incredible, as the mother, by her own account, had completed her schooling months before her unilateral removal of the child from Florida. The purpose of the trip to Florida clearly was for Shedine to attend the wedding in Tampa.
Two witnesses besides the mother testified as to the circumstances under which the mother took Shedine from the Miami airport. The paternal grandmother testified that the mother, accompanied by two gentlemen, accosted her in the gate area of the airport and demanded that she turn over Shedine and her suitcase and her passport. The grandmother credibly testified that she was surprised to see the mother there as she had not told the mother of the child's travel plans. One of the men with the mother, who identified himself as an uncle, was tall. The shorter man, who was never identified, wore sunglasses and carried a bag on his shoulder. All three spoke rudely to the grandmother, who felt threatened by them although it is undisputed that none of the three actually articulated a threat. The grandmother was especially intimidated by the man wearing sunglasses, as she thought perhaps he had a weapon in the bag he was holding. Throughout the incident, the child was crying and clinging to the grandmother and repeating, "I don't want to go."
The other witness concerning the airport incident was the maternal uncle who participated in it. His direct testimony was consistent with that of the mother, who had called him as her witness. He stated that he happened to run into the mother in the Miami airport (he [*3]lives in the Bronx), as he was in Miami to visit friends. According to the uncle, he merely accompanied the mother to pick up Shedine, and the transfer of the child was pleasant and quickly accomplished. Upon cross examination, he admitted that his encounter with the mother in the airport was pre-arranged. He could not recall the names of the friends he was visiting and eventually stated that the friends did not actually live in Miami. He could not recall where he went after leaving the airport, but after persistent questioning said it was Tampa. He could not recall how he traveled from Miami to Tampa, but thought he and the unnamed friends drove in a car, although he could not recall who drove. He had no idea of the name of the other man, whom he eventually acknowledged was present during the incident. With his mutative account, long pauses before answering straightforward questions and demeanor of acute discomfort, the uncle was a thoroughly incredible witness.
The Filing of Simultaneous Proceedings
On March 9, 2006, the day following the mother's flight from Florida with the child, the mother filed a petition for custody in the Family Court of the State of New York, County of New York for sole custody pursuant to Family Court Act Article 6. This petition was not filed as a UCCJEA petition because the mother averred that the father's whereabouts were unknown. This was not the case, as the mother was aware of the father's residence in Tampa, Florida. The father submitted to the court a copy of an email message from the mother, threatening to deceive the court in this very way. On April 26, 2006 Petitioner submitted an affidavit of personal service on the Respondent in Florida dated April 18th, 2006. As the time between service and court date was insufficient for out of state service, however, this court on April 26, 2006, issued a new summons for the father to be served by certified and regular mail returnable June 29, 2006. This was delivered on April 28, 2006, according to the United States Postal Service confirmation filed with this court.
The father, by his Florida attorney, informed the court by letter that he had on April 26, 2006, filed a Petition to Establish Primary Care, Visitation, and Related Relief in Hillsborough County (Tampa), Florida. This letter notes that it is not intended as a submission to the jurisdiction of the State of New York, but rather as notice of the Florida proceedings. Each parent maintains that the other's state lacks jurisdiction in this custody dispute. On June 29, 2006, an evidentiary hearing on the jurisdictional issues was begun by telephone with the father and his Florida counsel and the mother's Florida attorney present in Hillsborough County in the Circuit Court of the Thirteenth Judicial Circuit (Judge Elizabeth G. Rice, presiding) and the mother physically present in the Family Court in New York County. The hearing was concluded on July 14, 2006 in the same manner, with the father's witness, paternal grandmother, in Tampa and the mother's witness, maternal uncle, and the mother's New York attorney present in New York.
Jurisdiction Under the UCCJEA
Jurisdiction in child custody matters is governed by Domestic Relations Law Article 5-A, New York's codification of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). Domestic Relations Law § 76 (1) sets out all possible grounds for subject matter jurisdiction over a child custody dispute. Domestic Relations Law § 76 (2) indicates "[s]ubdivision one of this section is the exclusive jurisdictional basis for making a child custody [*4]determination by a court of this state." Domestic Relations Law § 76 (3) further clarifies "[p]hysical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination." Thus, although it appears that New York and Florida have both acquired personal jurisdiction over their respective respondents, personal jurisdiction is unavailing to determine which court should entertain the custody dispute.
The primary basis for jurisdiction under the UCCJEA is "home state" jurisdiction under Domestic Relations Law § 76 (1) (a). A home state is a state in which the child has resided for six months consecutively. Jurisdiction exists under Domestic Relations Law § 76 (1) (a) if the state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding. It is undisputed that the subject child in these proceedings has no home state for UCCJEA purposes. The child resided outside the United States prior to March 2006, and therefore has no home state, nor has she had a home state in the prior year.
If no state is the home state, a court of this state may exercise jurisdiction if the child and at least one parent have a significant connection with this state other than mere physical presence and there is also substantial evidence concerning the child's care, protection, training, and personal relationships in the state (see DRL § 76 [1] [b] [i]; [ii]). The mother in this case does have "significant connection" to the State of New York . The child has no connection, however, and neither is there "substantial evidence" concerning the child's care in New York. At the time of commencement of the proceedings, the child and her mother were both in New York, but the child had only been present in the state for one day. The mother has resided in New York since 2000, and is filing for residency papers in order to continue this residency. New York was the marital domicile for about three months, and is the jurisdiction of the divorce. These facts sustain a finding of the mother's significant connection to the state, but not Shedine's. The significant connections standard is a more stringent test than a "minimum contacts" test (see Vernon v. Vernon, 100 NY2d 960, 972 [2003]). Shedine has never been in New York for an extended period of time, and has no contacts in the state beyond her few visits. There is no substantial evidence regarding the child's care, protection, training, and personal relationships in the state. The New York Court of Appeals has held that "substantial evidence" requires an "optimum access to relevant evidence" (Vanneck v. Vanneck, 49 NY2d 602, 610 [1980)]). Shedine has never attended school in New York, and there are no relevant records predating the filing of this petition to be found in the state. Even the divorce decree does not make any mention of Shedine. The lack of evidence regarding Shedine from before the date of filing makes it clear that this court may not take jurisdiction pursuant to Domestic Relations Law § 76 (1) (b). However, the Florida courts are in no better position by the terms of Florida's counterpart UCCJEA law, Florida Statute § 61.514 (1) (b). Florida's connections are even slighter than those of New York, as Florida lacks even the physical presence of the child.
Declining Jurisdiction
Since the child has no home state and neither Florida nor New York has any significant connection with the child, jurisdiction would normally be assumed by the state in which the first proceeding was filed. Domestic Relations Law § 75-e indicates that a court may not exercise its jurisdiction under the UCCJEA if "at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state having jurisdiction substantially in conformity with this article, unless the proceeding has been [*5]terminated or is stayed by the court of the other state." The New York action was commenced by the filing of the Petition on March 9, 2006. Respondent did not file the Florida action until April 26, 2006. New York is accorded jurisdiction by Domestic Relations Law § 76 (1) (d), and since the action was first commenced in New York, the Florida court may not exercise jurisdiction over the matter unless and until New York terminates or stays its proceedings. 
Petitioner's Unjustifiable Conduct
Domestic Relations Law § 76-g (1) states, "if a court of this state has jurisdiction under this article because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, the court shall decline to exercise its jurisdiction." A finding that the mother engaged in "unjustifiable conduct" necessitates a declination of jurisdiction. The unjustifiable conduct provision of the UCCJEA is designed to deter removing a child across state lines to secure jurisdiction. Generally, courts apply this provision where a child has been removed contrary to an existing custody order (see Adoption House v. P.M., 2003 Del. Fam. Ct. LEXIS 227 *22 [Del. Fam Ct, Oct. 9, 2003] (noting that "[t]he few courts determining what constitutes unjustifiable conduct' have all considered factual scenarios involving whether a child had been brought into a state illegally.")). In the instant case, there is no custody order from any jurisdiction, and as such the mother's removal of the child to New York was not itself illegal. However, the absence of any custody order is substantially the result of the mother's failure to mention Shedine in the New York divorce granted in 2004.
Although most reported cases of unjustifiable conduct do deal with outright illegality, the Comment to UCCJEA Section 208 (the equivalent to New York's Domestic Relations Law § 76-g) makes clear that the statute need not be interpreted in such a restrictive fashion:
"There are still a number of cases where parents, or their surrogates, act in a reprehensible manner, such as removing, secreting, retaining, or restraining the child. This section ensures that abducting parents will not receive an advantage for their unjustifiable conduct. If the conduct which creates the jurisdiction is unjustified, courts must decline to exercise jurisdiction that is inappropriately invoked by one of the parties."
(Unif Child Custody Jurisdiction & Enforcement Act § 208, 9 ULA cmt at 684-85 [1999]).
While Petitioner did not "abduct" the child, her appropriation of the child at the airport was irresponsible and reprehensible, and her withholding of important information from both the Supreme Court in the divorce proceeding and from this court in the instant case shows a settled purpose to manipulate the courts to her own ends. These bad faith actions, totally at odds with the purposes of the UCCJEA, constitute unjustifiable conduct requiring this court to decline jurisdiction.
Inconvenient Forum
Even if the mother's conduct is not considered so egregious as to mandate declination of jurisdiction under the "unjustifiable conduct" provision, it should nevertheless weigh heavily in the more discretionary inconvenient forum analysis. Paragraph 1 of Domestic Relations Law section 76-f indicates that a court which otherwise has jurisdiction may determine that it is an inconvenient forum and that a court of another state is more appropriate. The enumerated factors [*6]to be considered, laid out in Domestic Relations Law § 76-f (2), do not favor either New York or Florida. Both courts are competent to determine the issues, there is no agreement as to jurisdiction nor is there any allegation of abuse or domestic violence, and neither party has claimed financial circumstances or the distances involved favor their choice of forum. However, this list is not exhaustive, and Domestic Relations Law § 76-f (2) states that the court "shall consider all relevant factors" in its analysis. The mother's conduct must be considered a relevant factor in determining whether New York is the most convenient forum. Here, the mother intercepted the child in transit in Florida, bringing her to New York without prior arrangement. Any convenience of New York as a forum is dependent upon the child's presence in New York, which is the direct result of the mother unilaterally removing the child from Miami to New York in March of 2006. Therefore, for this court to accept jurisdiction, would reward the mother's highhanded conduct in intercepting Shedine's trip to her father's wedding.
It is a basic purpose of the UCCJEA to deter parents from spiriting children to distant states to generate custody jurisdiction. In accordance with the principles of the UCCJEA, this court determines that Petitioner's wrongful conduct must not be rewarded, and that Florida, which is willing to assume jurisdiction, is the more appropriate forum in which to litigate this child's custody.ENTER:
_________________________________
Sara P. Schechter
Judge of the Family Court
Dated: New York, NY
 July 14, 2006